And I would like to reserve five minutes of my time, if I may. Mr. Berman, I'm not going to ask you all those questions I asked last time, which really maybe apply more to this case, but just for the record, you know, those questions would apply to this case as well. Certainly, Your Honor. And I think what is important to look at here, as I mentioned in the last case, Mr. Keller's counsel would have this Court carve out an exception to the First Amendment for the portrayal of someone. And there's no way that you can take his test that he says applies here, that he claims and convinced the district court applies, where if it's a realistic portrayal, then it's not protected by the First Amendment, you cannot take that test and apply it to any other kind of expressive work. Under Mr. Keller's theory, under the theory that the district court announced, you could not have an unauthorized biography of Mr. Keller. You could not have a motion picture like you did in many of the motion pictures, including the blind side, where you take historical facts and make them into a fictional somewhat, but also based on factual film. You couldn't do those things in any other kind of expressive work. And so if this Court takes the test that the district court adopted that Mr. Keller advocates, you would have to carve out an entire genre of unprotected speech based on realism, and that simply is not supported by law. What the U.S. the California Supreme Court said in the cases that are issued here, the Comedy 3 case and the Winners case, is very different from Mr. Keller's portrayal and very different from what the California, the district court said in Keller. They never said in Comedy 3 or in Winners that if it's a realistic portrayal, it's not protected or not transformative. To the contrary, the California Supreme Court said explicitly in Comedy 3 that things that are still can be transformative, still can be protected, include factual reporting, and that's a direct quote. Factual reporting, according to the California Supreme Court, can be transformative. The use of Andy Warhol's art, which were pictures of people that he did, you know, made them four times on a canvas and added color to them, those are nonetheless the actual portrayal of someone, a realistic portrayal of someone, and the California Supreme Court explicitly said those are still transformative, those are still protected under the Constitution. So the test that Mr. Keller wants you to adopt is simply not supported even by the cases that he relies on and that the district court relied on. But there are four different tests that we've offered to the Court, four different reasons why this case should be decided differently than the district court, and two of them are not really dealt with by Mr. Keller. I want to address those in the time that I have on my initial speech. One of them is the public interest test, which independently defeats Mr. Keller's right of publicity claim. In the CBC case, the Eighth Circuit saying, applying a test that is very similar to situations that are very similar involving fantasy football. So instead of a video game, it's a fantasy football league involving baseball. And they said the very same things that Mr. Keller is complaining about here, the use of statistics, the use of different kinds of attributes of players, that all of those in a game is protected by the First Amendment and you don't have to pay the players. Those exact same things are the things that are at issue here. Except the likenesses and the fact that it's an avatar. That's the key difference, isn't it? It's not the key, according to Mr. Keller. What he's emphasized is because the game itself uses the avatars, but it uses all the statistics for different players. And he says that by using all of those things, even though his name is not in the game, by using all of those things, that that somehow takes it out of the realm of the First Amendment. But what the CBC case, as well as a number of other cases we cite to the Court, say is that kind of factual information, that you can use those facts, you can use those attributes, you can talk about those things in the context of an express at work and it's protected under the First Amendment. The Gianfrido case from the California Court of Appeal, again, using information about real players, statistics, names, information about them in these programs, in these games, and on websites, the California Court of Appeals said that's      As panel that I saw earlier with Congratulations on the First Amendment. Counsel, EA, EA has sought licensing agreements before it produces this. It has a licensing agreement with the NCAA. And with some other, there's soy are other organizations. CLC? Yes.  So — so we have — they have some — they have agreements. Why did they have to go to CLC and get their permission to use the logos and teams? Why couldn't they just say, we'll just reproduce Arizona State or the Cornhuskers or whoever it is? Well, as a First Amendment lawyer, Your Honor, I would tell them they don't have to go to anybody to get permission to use the names or likenesses of players in games. If they wanted to use Mr. Keller in a game, just as they could use him in an unauthorized biography or any other expressive work, I would tell them as a First Amendment matter — So your answer is they did that, but they didn't have to? They didn't have to. They've entered into license — Yes. Your position is they could put the name on the jersey and the picture on the box. They could, Your Honor. What they've chosen to do because of licensing or agreements that they have that bring them other things that they wouldn't otherwise have the ability to have, including cooperation, including the use of materials, having assistant coaches and so forth participate in reviewing the games, those are things you can get by contract that you can't get otherwise. And so they're willing to do licensing arrangements with different entities, including the Professional Football League and the professional games. But in this case, the NCAA, they enter into licensing agreements for business purposes. But even if they had no other thing that they were getting and they simply chose to enter into a licensing agreement, what the U.S. Supreme Court said in Acuff-Rose and what courts have recognized in the Polydorus case as well, is that people often enter into licensing agreements simply because they don't want to have a fight with someone about whether the First Amendment applies. Those are very practical business considerations. And the U.S. Supreme Court said in the Camel versus Acuff-Rose case, you can't look at that and say that that somehow is evidence that you had to have a license. It's not. It's simply a business reality that people enter into licensing arrangements. In the CBC case, in fact, in the Eighth Circuit, this was a case where they had a licensing agreement with Major League Baseball. And when Major League Baseball refused to extend the license, they went ahead and continued manufacturing their fantasy football game anyway. And Major League Baseball said the same thing. Well, but they used to have a license. Isn't that evidence that they needed it? And the Eighth Circuit said, absolutely not. You look at it as whether or not the First Amendment protects this use, and if it does, that's the end of the equation, whether or not they thought having a license agreement would be useful for some other reason, or whether they simply wanted to avoid a fight. The other argument of public interest insofar as the statistics are concerned. I'm not sure I understand the argument insofar as the avatars and making you can change the avatar, you can make Mr. Keller do heroic deeds, or you can change whatever you want to his characteristics in the game. Why is that in the public interest? Just like a portrayal in a docudrama or a somewhat fictional portrayal based on real facts, all of those things have been found to be protected under the First Amendment under the public interest standards, even if they're not entirely factual. The cartoons case, for example, from the Tenth Circuit involved the use of players' likenesses and statistics and other things on parody baseball cards. They weren't completely factual. They were making fun of the players, and they added some things that actually weren't factual at all. They were completely made up. Yet the Tenth Circuit said those are protected under the First Amendment, because that's the kind of expressive use that we would want to have protected. So as a matter of public interest, when you're talking about real people and celebrities and people who have some interest to the public, that you're allowed to talk about them, and the First Amendment protects that. The right of publicity is a very narrow right. Just as the Lanham Act is a narrow right that's created by the State. It's not something that exists as a constitutional right. And in evaluating the difference between the rights of publicity that Mr. Keller is advocating and the First Amendment rights, it's important that this Court look at how you balance those interests. And it's not an equivalent balance. What the California Supreme Court made clear in the Guglielmi case is that the balance has to weigh heavily on the side of the First Amendment. And in fact, they say that rights of publicity should only be recognized, only be recognized, quote, if the proprietary interest at issue clearly outweigh the value of free expression. And that was the case involving a fictional portrayal of Rudolph Valentino in a movie. So they took some facts, just as these games take facts, but they also manipulated some facts. They made a fictional portrayal. They created conversations that never happened. Kennedy, did they create Rudolph Valentino? I'm sorry? Did they create Rudolph Valentino? They did not create Rudolph Valentino, Your Honor, but they had a character who was made up to look like Rudolph Valentino. If they had used an avatar to portray that person in the movie as opposed to using an actual actor portrayed to look like Rudolph Valentino, the distinction didn't make any difference at all. It wasn't actually Rudolph Valentino in the movie. It was a fictional portrayal of him. How far does this argument push? How far does it carry? At what point do we cry uncle when somebody decides to make a movie based on an avatar of Tom Cruise and other living persons and says, I don't need to hire Tom Cruise at $20 million a picture. I can do it cheaper by going to, you know, Pixar, whoever the other companies are that create these, and we'll just make a movie? Well, first again, Your Honor, that's not this scenario. But even if it were, where you draw the line is where there's something that is misleading about the way you're portraying that to consumers. Okay, all right. But you see, implicit in your answer was you do think there would be a problem with that. No, Your Honor. I'm saying that all you're doing is putting a character in the movie. Even if you're saying it's Tom Cruise in the movie. If you're doing a movie about Tom Cruise, you can do that and that's protected under the First Amendment. If you're doing a movie about other characters and you have a character in it, for example, Judge Quist's question from the last round of argument, if you're having a dream sequence and the person is dreaming about Tom Cruise, you can use that in a movie and you don't have to hire Tom Cruise for that. I don't remember if they made Top Gun 2, but if they made Top Gun 2 or Top Gun 3, whatever number you have to add there, and decided to go ahead and use a younger Tom Cruise, not pay him a penny, you're suggesting that they could do that and there wouldn't be any problem with that? Under the right of publicity, Your Honor, what they would have to say is if you're using someone and portraying that person as if it is actually Tom Cruise, that's a different scenario. If you're explicitly misleading the public into thinking Tom Cruise is appearing in the movie, you're advertising it as, see Tom Cruise's latest movie, that's a different situation. See Tom Cruise's avatar in this movie. All the benefits of Tom Cruise, and not only that, but we'll pass the savings on to you, you can get in for $7.50 instead of $10 at the movie theater. Well, Your Honor, again, I would go back to the Guglielmi case. Nobody misunderstood that this was not Rudolph Valentino appearing in the film that was at issue there. It was a documentary film, docudrama actually, about Rudolph Valentino. They had somebody made up to look like Rudolph Valentino. They didn't hire Rudolph Valentino. Even if he'd been alive, they didn't have to hire him to be in that movie. They could make a movie about him and it was absolutely protected. Now, if you get to the point in the future, which is not this case, if you get into the point where what the court believes is we have a zucchini situation, where you're taking the person's entire performance and there's nothing else of value that they had to sell to the public, then maybe that is zucchini. But that's not this case. And even in zucchini, they were talking about taking the actual portrayal, the actual performance, and showing it so that nobody had to come and pay to go see this person being shot out of a cannonball. I think we're a long way from saying that no one is going to watch professional football or college football because somebody is an avatar in a game that people can manipulate. In fact, as I think I mentioned the last time, you know, 111 million people watched the Super Bowl, even though these games have been out for 20 years. So we're not talking about replacing the performance, the actual live performance of professional athletes by having avatars in games. So zucchini is very far from the situation that the court needs to be concerned about. Even in Googly Emmy, the Googly Emmy court actually distinguished zucchini and said that is not this case. This is not the case where you're taking someone's entire performance and portraying it so that they no longer have anything to sell. This is an expressive work that is portraying someone in this either factual or fictional way, and that that is absolutely protected under the First Amendment. 3344D, under the California statute for misappropriation, also provides an independent basis for this court to find that the district court was an error. The district court said that 3344D, which applies to public affairs, news, and other kinds of use in expressive works, is not the case. That that is, as a matter of law, not a use that can give rise to a cause of action. And the district court said, well, it only applies to news. But by its very language, that statute, that provision, goes well beyond news. It includes public affairs. And this Court in the New Kids case said that this is actually far broader than the public affairs protections under the First Amendment. It means to go beyond things that would be protected in other contexts. It goes beyond the public interest test that has been recognized in other cases. But anything that's even related to real life occurrences, as the Court found in the Dora case, that those things fall within that very broad provision under 3344. The Rogers test and the transformative use test, I want to mention just briefly, the transformative use test, with due respect to the district judge, was completely misapplied here. Again, as I said at the beginning, if you're trying to decide whether somebody's name or likeness is by itself transformative, you would never have a case where you could use a person's real name in an expressive work. Because by its very nature, the use of a name is not transformative. You could never have an expressive work that refers to Sam Keller in any way, because it's not transformative under his test. What the California Supreme Court actually said is that you look at the entire work, which is consistent with the way the Court approaches copyright cases. You look at the entire work, not just the little bit that's claimed to be infringing, and you see if there's anything else in there other than the allegedly infringing part to decide whether it's transformative. You could take Mr. Keller or what he claims to be his image out of this game entirely. Is there anything left? Absolutely. You could take players out of the game, and there's a lot of other expressive material that's in the games that was created by Electronic Arts. The games have an entire world of stadiums and coaches and audio that's created, the play-by-play commentating, all of which is created by Electronic Arts. There are storylines that allow you to follow a college player's career from day one, to choose their classes, to choose how much they practice and see how that impacts those players on the field. You can follow an entire program. You can take USC football and follow it for 30 years and make the decisions about recruiting from high school and make the decisions about playing or not playing certain players and see how that dynasty mode affects the team that you're following. Those are all expressive things that EA has added to this game. It is not simply a reproduction of Mr. Keller's likeness as it arguably was in the Comedy 3 case. I want to reserve the last few minutes of my argument. Of course. May it please the Court, Steve Berman on behalf of Mr. Keller. I'd like to start with something new, something that I didn't touch on in the last argument, and that is to start with the No Doubt case because I think the No Doubt case answers many of the points that counsel just made. And I start with what I think is the key passage in that case for the purposes of this appeal. There the Court said, quote, insofar as the depiction of No Doubt is concerned, the graphics and other background content of the game are secondary, and the expressive elements of the game remain manifestly subordinated to the overall goal of a conventional portrayal of No Doubt so as to commercially exploit its fame. And that's exactly what we have here. These so-called expressive elements, which I don't agree are expressive, the stadium noise, the fans, the other factors that she mentioned, they're secondary. It's clear that the primary and predominant purpose of the game is to take the player's image, replicate it precisely because that's what sells the game. So under the No Doubt test, we clearly meet that definition. One of the things that puzzles me about this case in contrast to Brown is the essential right of publicity. I realize that EA has conceded for the purposes of this argument and below that there is a right of publicity, but we can affirm on any ground. What right of publicity does a college athlete have? Well, he has the same rights as any other person. Except that even if EA wanted to license the college players, they couldn't under NCAA rules. They are prohibited from exploiting. So at the end of the day, how do you prove any damages in this case? Well, first of all, two points to that answer. The NCAA in its amicus brief at page four admits that it does not own the player's likenesses. They own the likenesses. They can decide to forego their eligibility if they want and to require EA to pay for it. So they own the license. They have the same property right that any citizen in the State of California has. They have statutory right of publicity and a common law right of publicity. And they haven't waived that right of publicity. No, but in order to play football, they have to waive the right. They have licensed, in effect, their likeness rights to the NCAA and to no one else. They did not give EA the right to exploit commercially their property rights. No, I understand that. I'm just saying, in contrast to the Brown case, college athletes have a markedly limited or no right of publicity per se. They can't, they can't, EA, if EA wanted to license it, your client could not grant the license without giving up his eligibility. That's right. And his eligibility is what creates these statistics. But there's no surrender of the rights to, once they have agreed to the NCAA that their likenesses can't be used, they can't profit. They haven't surrendered their rights vis-a-vis anyone else. They still have those rights. And Mr. Keller is no longer a student. And they're still using his name and likeness. And I realize they've conceded that for the purpose of this argument, so why don't you get back to your main points? The other part of no doubt that I think is instructive is that the court said that it's context in which the celebrity's likeness is used that's critical. And what they looked at there was the fact that the rock band was being placed in the exact same contest that the band earned its fame, to use the words of no doubt. And that is a very important point here because Keller is put in the same context that he appears in in college football. He's in the game as a college football player doing exactly what he does in real life. So context is not the work as a whole, but as he appeared in real life compared to the game. I think the key here is we are under the transfer-morbid test. And this is a unique circumstance here because EA's whole purpose in creating this game and marketing it the way they do is realism. Their slogan is, if it's in the game, it's in our game. So the idea of the transformative test is to protect storytelling, to protect creativity. There's no creativity here. There's no story. It's just taking the likeness and letting someone use that likeness without telling a story. You would concede, however, that the game is interactive in the fashion that you can transform the characters, you can transform the storylines, correct? I concede that, and I don't think it makes a difference because the transformation test focuses on whether the creator has done something transformative. In the Kirby case, the creators had made the game very storytelling-like. They made it creative. So when it got to the consumer, the consumer interacts, but there's a story  Here, there's nothing creative in the game. In fact, again, they're selling the game because we're not telling you a story. We're making it realistic. That's why people want to buy the game. That's why they market it. So it's really the opposite of transformative. That's what they strive for. And in fact, if you look at what they've done, it's kind of ironic because the NCAA, in its brief, claims the avatars do not mimic the players. Really? Same height, same weight. This is Sam Keller. Game versus real life. Same skin tone, same hair color, same hairstyle. Right-handed, right-handed. Same home state, same facial features, same accessories. He wears a face mask. Same teammates. So they strive for realism. They're not trying to tell a story. And the test under the transformative test, it's a quantitative test. You're supposed to look to see whether the literal or imitative elements predominate over the expressive elements. And I submit to the court that it's clear here that there is a predominance of the literal and the imitative rather than the creative. The Guglielmi case, which counsel relied on the first time and the last time, they didn't even get to the transformative test. Turning back to one of the points, whether you look at the context or the game as a whole, and counsel says the district court erred by looking only at the context rather than the game as a whole. And I would refer, Your Honors, to the district court in the Davis case. Came out the exact same way as the judge did here. And here's what he said about that argument. Quote, it would make little sense for the rule to be otherwise if, as EA urges, any expressive elements within the larger work were somehow to transform an otherwise conventional use of a celebrity's likeness, the right of publicity would be effectively eviscerated. And that would be true here, too. If they have the slightest bit of expression, let's say that the stadium noise is expressive, they're saying look at that, and therefore it's not protected, and that's not the case. And in fact, if you look carefully at the Kirby case and the No Doubt case, in the Kirby case, they only focused on what Kirby did in the game, not the other reporters in the game. In the No Doubt case, there were many other players and bands that you could use. They focused on what they did with Gwen Stefani and her band. So the context that the district court used, the context test, was appropriate, and it makes good policy sense. Counsel suggests that you adopt a new test. Well, first of all, both the Kirby court, the No Doubt court, and the Hilton court all found the transformative test to be straightforward. In fact, the Kirby court said it's a very straightforward test. Counsel then says, well, you're going to chill movies. You're going to chill Forrest Gump and King's Speech and Social Network. Your Honors, I say to that, nonsense. That's complete nonsense. The winter test has been around for nine years, and it's been six years since Kirby. But the King's Speech came out and Social Network came out without any fear that they were somehow going to violate the right of publicity. There's been no chilling. But the argument subsequently is also incorrect. There's a vast difference between a Social Network, King's Speech. They're telling a story. They're transforming. They're being creative. That's not what we have here. Unlike in these films, there's no story to the college sport game here. It's not a story. Unlike in films, there's no character development. The avatars are merely likenesses. They don't have personalities. And unlike in films, there's no expression in the background about the avatar. It's just a reproduction of Mr. Keller and the other players as they appear in real life. Now, Judge Bybee, you asked why do they pay everyone else? It's a good question. They pay $35 million a year to the NFL for player likenesses. They pay the CLC to use the replications of the logos, the uniforms, and the mascots. They don't assert a First Amendment right, but they do here because they here because of what you mentioned, Your Honor. Well, there's no legal way for them to pay without destroying the college football player's career. Well, no. I mean, there is a legal way to do it. You could put, without destroying amateurism, you put the money in trust until the players are gone. So it can be done, but that's for another day I submit in the district court. Turning to whether or not you should adopt a new test, there's one point I want to make on that that we didn't make in our briefs and it occurred to me. And that is the appeal, we're here on an anti-slap appeal. And the test under the anti-slap appeal is whether at the time we filed our case we had, quote, minimal merits at the time we filed it. At the time, so to answer that question, I think you have to apply the test that was in existence in this circuit at the time we filed the case, and that is the transformative test. If you want to change that test, the time to do it is not on the slap statute, but when we come back here later in the day, if we come back here. And I would also note that the Rogers test that counsel urges, the Rogers court itself said because the right of publicity, unlike the Lanham Act, has no likelihood of confusion requirement, it's potentially more expansive than the Lanham Act. And the Rogers court concluded in essence it would not be appropriate to apply that test, as did the Hart case that they cite from the Third Circuit. Now, there's one last argument that I'd like to make and then I will rest unless there's questions. And that is this waiver argument. I don't think you need to get to this issue. I know it's an interesting issue, the First Amendment, because we allege in our contract we agree not to use player likenesses. We don't have to win this argument. We just have to show a probability of prevailing on it because we're in this slap procedural situation. So EA has the burden of approving this affirmative defense as a matter of law, and it hasn't done so here.  It hasn't challenged that and it's in our pleading. So they haven't met their affirmative defense. To the extent they say, well, you didn't put in evidence of this contract, they admitted to the language, the correctness of the language and its existence at docket entry 61-67-1, excuse me, at pages 5 and 6, where they admitted that the following paragraphs from the agreements and then they cite to these agreements. So they admitted to their existence. They didn't put them in the record. So they haven't met their burden of this affirmative defense. So we have put in place that we have a waiver argument that should be heard by the district court. And you don't even need to get to that issue because the First Amendment issues because it could be remanded on that basis alone and it should be, as the dissent pointed out in the no doubt case. So the bottom line inquiry here is whether the literal or imitative elements of the creative or creative elements dominate the work. That's the test. And as I said before and as I'll end of saying, as EA says, if it's in the game, it's in our game. It's not creative. And therefore, they haven't met their burden to show as a matter of law. There's no Forrest Gump or social network type expression here that should prevail over the player's economic rights. This is pure exploitation of the player's economic rights. There is no storytelling. There's no First Amendment as a matter of law. And unless you have any questions, that's all I have. Thank you, counsel. Thank you. Can I have the five extra minutes and some other argument? Sorry? Can I have the five extra minutes? That's right. We'll put it in the bank. Ms. Sager. Thank you, Your Honor. I'll start briefly on waiver. I think this has really become an issue really on appeal. The fact that they've alleged something in the complaint is irrelevant on a slap motion. There's a burden of coming forward with evidence on a slap motion. The law is very clear. It's not enough to simply allege it in your pleadings. And the burden is on Mr. Keller to have come up with evidence in the district court, and he chose not to do that. Not because they didn't have a copy of the agreement. They had it. They chose not to present it to the district court. But even if you look at the language that they have alleged, what they've alleged that they would have proven if they'd been adept to have included in the district court record below, which they didn't, what they've alleged the language says is that EA shall not seek permission from college athletes to use their names and images in the game, and they shall not pay them. So there's nothing in there that says that EA doesn't have a First Amendment right to use them anyway. It simply says, according to them, you shall not pay college athletes because the NCAA rules don't allow you to pay college athletes. Under the First Amendment, there has to be a clear and knowing and convincing articulation of a waiver of constitutional rights. They haven't come close to meeting that, even with the evidence they say they would have presented if they'd had that opportunity below. Now, on Activision and the transformative use test, I'm going to deal with Activision and the district court decisions in Keller and Davis together because they're really one decision. What the Activision court did when it got past the idea that there's a contract there that prohibits them from doing exactly what they did, which distinguishes that case from our case in any event. But what the Activision court did and what the Davis court did was they followed Keller, and they all used the same analysis that the district court used in Keller. So for all the reasons that we've given to the court in our briefing as to why the Keller decision was wrongly decided, the same exact things apply to Activision and Davis. It's not taking a different analysis or even different courts. In the Davis case, it was the same district court that decided the first decision. But all of them have made significant errors in application of the transformative use test. I have to quarrel with counsel suggesting that the transformative use test is this really easy, straightforward, everybody agrees on how to apply it test. Even in the Winters case, which the California Supreme Court said, this is an easy one, guys. This is a clear-cut case. This is clearly transformative. They had to overrule a three-judge panel of the appellate court. So it wasn't so easy that the court of appeal and the district court and the trial court in that case all agreed. According to them, the court of appeal got it wrong, and they said that was an easy case. The transformative use test, though, does not say you cannot use real people, real names, or realistic portrayals and still have it be transformative. And while counsel wants to say, well, this is really different from the King's speech and all those other cases that would be bad if you had to decide this based on other kinds of expressive works, he doesn't really explain that. Because the California Supreme Court said in Comedy 3, and it said in Winters, that you can use realistic portrayals and still have it be transformative. Andy Warhol was one of the examples the court gave. They used the example from Guglielmi, which they cited with approval, which is a realistic portrayal of Rudolph Valentino. So it's not that having realism makes it non-transformative. And if Mr. Keller wants to take that position, he does cut out all of these other expressive works. How can you have a movie like The Social Network, where you're portraying someone, not using an avatar, but using an actor that's made up to look exactly like Mark Zuckerberg, how can you have that movie portraying that live person in a context in which they actually appear in real life according to Mr. Keller? How is that different for portraying a football player or a basketball player in realistic ways in the context in which they appear in a video game? It isn't different at all. But what he really wants to say without saying it is video games are different. You have to treat them differently. But the U.S. Supreme Court has said unambiguously that is not true. You don't treat them differently. You treat them precisely the same. And if you treat them precisely the same, then realistic portrayals, as the California Supreme Court said, factual reporting is still transformative. He's dismissive of all the different things that go into the EA games that make it transformative, but he can't get around the facts. There are all these other things in the game besides just a portrayal of a likeness. And the test that he articulates at the end of his argument, I'm not sure where that comes from, because that's not the test that the courts have articulated. Yes, Your Honor. No, I'm just stretching my hand. Sorry. According to the California Supreme Court, the transformative use test, and I asked the Court to look at the language in Comedy 3, says, do you take the likeness and is it just the likeness? Is that all there is, like they said there was in Comedy 3? Or is the likeness raw materials from which you created something else? There's no question here that to the extent Mr. Keller is in the NCAA games, his game has all of these other creative elements that I mentioned. There is no possibility if you apply winners in Comedy 3 that this could not be transformative. But this Court has an opportunity to clean up the law here, which has resulted in all of these completely inconsistent decisions that have to be reversed by appellate courts, and that can be fixed by this Court. Thank you. Thank you. The case, as heard, will be submitted for decision. I want to thank counsel for all their excellent arguments in briefing the case, as well as counsel Beakey, some of whom are here, I see. It's an interesting case, an interesting two cases. We'll get to it as soon as we can. Thank you very much.
judges: Thomas, Bybee, Cjj Quist (W. Michigan), Dj